******************************************

The ''officially released'' date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the ''officially released''
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

# EMILY BYRNE *v.* AVERY CENTER FOR OBSTETRICS AND GYNECOLOGY, P.C.
## (AC 43413)

Cradle, Clark and Harper, Js.

*Syllabus*

The plaintiff patient sought to recover damages from the defendant medical provider for injuries allegedly sustained as a result of, inter alia, the defendant's breach of its duty of patient confidentiality. Without the plaintiff's knowledge or authorization, in response to a subpoena duces tecum issued in connection with a paternity action filed in the Probate Court against the plaintiff by M, an individual with whom the plaintiff previously had a relationship, the defendant sent the plaintiff's medical records to the Probate Court. The records were placed in the Probate Court's public file for the paternity action and were accessed by M, who used the information contained therein to harass and threaten the plaintiff. Although the plaintiff had previously filed for bankruptcy and the bankruptcy court had granted the application of the appointed trustee of her estate to employ special counsel to pursue a claim against the defendant, the plaintiff commenced the action in her individual capacity. In response, the defendant admitted that it had breached its duty of confidentiality and was negligent in sending the plaintiff's records to the Probate Court but denied that it was the proximate cause of the plaintiff's injuries. The plaintiff filed an offer of judgment, to which the defendant objected. Thereafter, the trial court granted the plaintiff's motion to join the bankruptcy trustee as a party plaintiff. The jury returned a general verdict in favor of the plaintiff and awarded her noneconomic damages. Thereafter, the trial court denied the defendant's motion for a new trial, to set aside the verdict and for remittitur, and it granted the plaintiff's motion for offer of judgment interest. On the defendant's appeal to this court, *held*:

1. The defendant failed to prove that it was harmed or that injustice resulted from the trial court's limiting of the scope of the testimony of K, the retired probate judge acting as the defendant's expert witness: although the trial court precluded K from opining with regard to the specific facts of the case or stating, as the defendant would have liked, that "it was extraordinarily abnormal for the Probate Court clerk to have placed the plaintiff's medical records in a public file," his testimony left no doubt that the clerk had mishandled the records; moreover, on the basis of the testimony that was allowed, the members of the jury were capable of determining whether the clerk's handling of the records was so extraordinary that it broke the chain of causation between the defendant's conduct and the plaintiff's injury.

2. Contrary to the defendant's claim, the trial court did not improperly permit the plaintiff to submit a claim for future emotional damages to the jury on the basis of a single, vague, speculative statement in a hearsay report:
   a. The trial court did not abuse its discretion when it admitted into evidence the psychological report written by the plaintiff's treating psychologist, B: because the report was written on B's stationary and was signed by B, there was a presumption that it was made in the ordinary course of business and was admissible as a business entry; moreover, contrary to the defendant's claim, the report was not inadmissible pursuant to statute (§ 52-174 (b)) for being prepared in anticipation of litigation because the defendant was in possession of the report when it deposed B and, therefore, had the opportunity to cross-examine B as to his opinions therein even though B was unable to testify at trial.
   b. The trial court properly submitted the plaintiff's claim for future noneconomic damages to the jury on the basis of the evidence presented at trial: there was evidence in the record, in addition to B's report, to support a showing of a reasonable probability of future or ongoing injury, including the testimony of the plaintiff, the testimony of a licensed clinical social worker who treated the plaintiff eight years after her medical records had been made public, and the length of time between the admitted negligence of the defendant and the return of the verdict;

moreover, the fact that there was contrary evidence in the record from the plaintiff's other treating physicians regarding future injury was not a sufficient reason for the trial court to withhold its instruction on future noneconomic damages.

c. The trial court did not abuse its discretion by denying the defendant's request to submit to the jury interrogatories distinguishing between past and future damages: the request was untimely filed, as the defendant did not request such interrogatories until after the trial court had given the majority of its charge to the jury, and, pursuant to the applicable rule of practice (§ 16-22), written requests for jury interrogatories must be filed with the clerk of the trial court before the beginning of arguments.

3. The trial court's award of offer of judgment interest was not improper: pursuant to *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.* (297 Conn. 105), the offer of judgment was validated at the time the trustee was added as a party plaintiff; moreover, since *DiLieto*, neither the legislature nor the rules committee of the Superior Court has amended the statutes or rules governing the procedures applicable to offers of judgment when a bankruptcy trustee is substituted as a party plaintiff under the applicable statute (§ 52-109), despite our Supreme Court's express suggestion in *DiLieto* that they do so; accordingly, in making its award, the trial court properly followed our Supreme Court's holding in *DiLieto*.

Argued September 22, 2021—officially released May 10, 2022

*Procedural History*

Action to recover damages for, inter alia, the defendant's alleged negligent infliction of emotional distress, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Hon. Richard P. Gilardi*, judge trial referee, granted the plaintiff's motion to add Douglas J. Wolinsky, the bankruptcy trustee of her estate, as a party plaintiff; thereafter, the matter was tried to the jury before *Welch, J.*; verdict for the plaintiff; subsequently, the court, *Welch, J.*, denied the defendant's motion for a new trial, to set aside the verdict and/or for remittitur and rendered judgment in accordance with the verdict; thereafter, the court, *Welch, J.*, granted the plaintiff's motion for offer of judgment interest, attorney's fees and postjudgment interest, and the defendant appealed to this court. *Affirmed.*

*Jeffrey R. Babbin*, with whom were *James F. Biondo* and, on the brief, *Richard Luedeman* and *Diana M. Carlino*, for the appellant (defendant).

*Bruce L. Elstein*, for the appellee (plaintiff).

*Opinion*

CRADLE, J. In 2007, the plaintiff[1] Emily Byrne commenced this action against the defendant, Avery Center for Obstetrics and Gynecology, P.C., alleging that the defendant had breached its duty of patient confidentiality by responding to a subpoena duces tecum and negligently sending the plaintiff's medical records to the New Haven Regional Children's Probate Court (Children's Probate Court) without her knowledge and authorization. Before trial, the defendant admitted that it had breached its privacy policy and its agreement to keep the plaintiff's medical records confidential and had negligently mailed the records to the Children's Probate Court without her knowledge. The defendant contended at trial, however, that its actions were not the proximate cause of the plaintiff's injuries. The jury returned a verdict in favor of the plaintiff, and the trial court, *Welch, J.*, granted the plaintiff's motion for offer of judgment interest, attorney's fees, and postjudgment interest. On appeal, the defendant claims that the court improperly (1) limited the testimony of its expert witness; (2) admitted into evidence a medical report, charged the jury concerning future noneconomic damages, and denied its request for a jury interrogatory differentiating between past and future damages; and (3) granted the plaintiff's motion for offer of judgment interest pursuant to General Statutes (Rev. to 2005) § 52-192a.[2] We affirm the judgment of the trial court.

The following relevant facts and procedural history are set forth in our Supreme Court's earlier decision in *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 102 A.3d 32 (2014). "Before July 12, 2005, the defendant provided the plaintiff [with] gynecological and obstetrical care and treatment. The defendant provided its patients, including the plaintiff, with notice of its privacy policy regarding protected health information and agreed, based on this policy and on law, that it would not disclose the plaintiff's health information without her authorization.

"In May, 2004, the plaintiff began a personal relationship with Andro Mendoza, which lasted until September, 2004.[3] . . . In October, 2004, she instructed the defendant not to release her medical records to Mendoza. In March, 2005, she moved from Connecticut to Vermont where she presently lives. On May 31, 2005, Mendoza filed paternity actions against the plaintiff in Connecticut and Vermont. Thereafter, the defendant was served with a subpoena requesting its presence together with the plaintiff's medical records at the . . . Children's [Probate Court] on July 12, 2005. The defendant did not alert the plaintiff of the subpoena, file a motion to quash it or appear in court. Rather, the defendant mailed a copy of the plaintiff's medical file to the court around July 12, 2005. In September, 2005, [Mendoza] informed [the] plaintiff by telephone that he

reviewed [the] plaintiff's medical file in the court file. On September 15, 2005, the plaintiff filed a motion to seal her medical file, which was granted. The plaintiff alleges that she suffered harassment and extortion threats from Mendoza since he viewed her medical records.[4] . . .

"The plaintiff subsequently brought this action against the defendant. Specifically, the operative complaint in the present case alleges that the defendant: (1) breached its contract with her when it violated its privacy policy by disclosing her protected health information without authorization; (2) acted negligently by failing to use proper and reasonable care in protecting her medical file, including disclosing it without authorization in violation of General Statutes § 52-146o[5] and the [United States Department of Health and Human Services'] regulations implementing [the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq.]; (3) made a negligent misrepresentation, upon which the plaintiff relied to her detriment, that her medical file and the privacy of her health information would be protected in accordance with the law;[6] and (4) engaged in conduct constituting negligent infliction of emotional distress." (Footnotes added; footnotes omitted; footnotes in original; internal quotation marks omitted.) Id., 437–39.[7]

On October 9, 2018, the defendant filed an amended answer wherein it admitted that it had breached its duty of confidentiality and admitted that it was negligent in sending the plaintiff's medical records to the Children's Probate Court without the plaintiff's authorization. The defendant, however, denied that its actions were the proximate cause of the plaintiff's injuries and damages.

The case was tried to a jury over several days in late November and early December, 2018. The crux of the plaintiff's case was that the defendant's failure to notify her of the subpoena before sending her medical records to the Children's Probate Court was a substantial factor in causing her emotional harm. The plaintiff testified and presented testimonial and documentary evidence regarding Mendoza's harassment and lawsuits and her past and then current mental health history.

In its defense, the defendant contended that sending the plaintiff's medical records to the Children's Probate Court was not the proximate cause of her injuries. It argued that the Children's Probate Court mishandled the records and was the proximate cause of her injuries. The defendant also argued that the plaintiff's emotional distress was caused by Mendoza's harassment, communications, and lawsuits against her and her family.[8]

The jury returned a general verdict in favor of the plaintiff and awarded her noneconomic damages in the amount of $853,000.[9] On March 7, 2019, the defendant filed a motion for a new trial, to set aside the verdict and

for remittitur on the grounds that the court improperly (1) admitted a report prepared by the plaintiff's expert into evidence because it was speculative and permitted the jury to consider an award of future damages, (2) instructed the jury on future noneconomic damages, and (3) failed to provide a verdict sheet that differentiated between past and future damages. The court denied the defendant's motion.

The plaintiff also filed a motion for offer of judgment interest, attorney's fees, and postjudgment interest, which the defendant opposed. The court granted the plaintiff's motion and awarded offer of judgment interest at the rate of 12 percent per annum, postjudgment interest at the rate of 8 percent per annum, and attorney's fees of $350. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court improperly precluded its expert witness, retired probate judge Robert K. Killian, Jr., from testifying that "it was extraordinarily abnormal for the [Children's] Probate Court clerk to have placed the plaintiff's medical records in a public file accessible by Mendoza." The defendant argues that the court erred in precluding Killian's testimony "regarding the [Children's] Probate Court clerk's failure to follow normal, expected protocols for confidentiality with respect to the handling of the plaintiff's medical records." The defendant contends that, "because Probate Courts are expected not to make medical records public, [the defendant's] sending the records to the [Children's] Probate Court was not a proximate cause of their public disclosure to Mendoza." The defendant asserts that Killian's testimony in this regard was crucial to its challenge to causation and, thus, that the court's preclusion of it was highly prejudicial to its defense. We are not persuaded.

The following facts are relevant to our resolution of the defendant's claim. On March 23, 2018, the defendant disclosed Killian as an expert witness to testify on the issues of liability and causation, stating that Killian had been a Probate Court judge for more than thirty years and had served as chief judge and president judge of the Connecticut Probate Assembly. The defendant expected Killian to testify that (1) whether the plaintiff's records were mailed or hand delivered to the court made no difference as to how the clerk was to handle them; (2) in 2005, Probate Court procedures in general required medical records to remain in the custody of the clerk under protective seal until the court ordered their release; (3) the Children's Probate Court clerk had mishandled the plaintiff's medical records by placing them in a publicly accessible file without a court order or the agreement of the parties; and (4) the clerk's mishandling of the records was the reason Mendoza gained access to the plaintiff's medical records.

On October 3, 2018, the plaintiff filed a motion in limine asking the court to preclude Killian from testifying that it was the clerk's mishandling of the plaintiff's medical records that proximately caused her injuries. The plaintiff first argued that the defendant had not made the Children's Probate Court an apportionment defendant and, therefore, the defendant should be precluded from blaming a nonparty for any negligence or harm caused to the plaintiff by the disclosure of her medical records. Second, the plaintiff noted that when she deposed Killian, he testified that Probate Court procedures are localized throughout Connecticut and that he had never presided at the Children's Probate Court in New Haven, where the plaintiff's records were mailed. Consequently, the plaintiff contended that Killian's proposed testimony was neither relevant nor accurate.

The parties appeared before the court, *Kamp, J.*, on October 11, 2018, to argue the plaintiff's motion in limine. In opposing the motion in limine, the defendant argued that it was not seeking to apportion liability but that Killian's testimony was to address the question of causation. In support of its position, the defendant argued that Killian's expert testimony was admissible under a general denial, citing *Bernier* v. *National Fence Co.*, 176 Conn. 622, 630, 410 A.2d 1007 (1979) for the proposition that facts inconsistent with the plaintiff's allegations that the proximate cause of her injuries was the defendant's negligence, whether sole or concurrent, were admissible under a general denial. With respect to Killian's proposed testimony, Judge Kamp ruled: "[I]f I'm going to allow this, which I was inclined to allow you to do, it was only for the purpose of arguing that the conduct of your client was not a substantial factor under a proximate cause analysis because . . . you've admitted liability already. You've admitted that your conduct was negligent.

\* \* \*

But I do think that you're entitled to make the break in causation argument, but you can't do it in a way that you're really seeking to apportion liability to [a] nonparty." Trial commenced before Judge Kamp on October 16, 2018, but a mistrial was declared on the basis of comments made by counsel during opening statements.

Trial commenced before Judge Welch on November 27, 2018. During its case, the defendant produced Killian as a witness and made an offer of proof as to his testimony. During the offer of proof, Killian testified in general as to statewide Probate Court procedures and policies and how medical records should be handled by the Probate Court clerk, whether mailed or hand delivered. He further testified that when the plaintiff's records arrived at the Children's Probate Court, the clerk should have taken custody of them and placed

them in a sealed file. On cross-examination, Killian testified that, in 2005, there were no statewide written policies, procedures, manuals, rules, regulations, or directives that required a Probate Court to handle confidential records in a specific way.[10] Every Probate Court had its own rules. Killian himself had never presided in the Children's Probate Court and had never spoken to the administrative judge or the clerk about the present case or the procedures that existed in that court in 2005. He also had no knowledge of how the plaintiff's records were handled by the clerk when they arrived in the Children's Probate Court in July, 2005.

Following the offer of proof, Judge Welch recognized Killian as an expert with regard to Probate Court policies and procedures in general but ruled that he could testify "on a very limited basis, in terms of the general probate rules or the general Probate Court procedures . . . not specific to this case."[11] Before Killian testified, the court instructed the jury as to the purpose of his testimony.[12]

We begin with the applicable standard of review. "[T]he motion in limine . . . has generally been used in Connecticut courts to invoke a trial judge's inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Finally, the standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely affected] the result. . . . Despite this deferential standard, the trial court's discretion is not absolute. Provided the defendant demonstrates that substantial prejudice or injustice resulted, evidentiary rulings will be overturned on appeal [when] the record reveals that the trial court could not reasonably conclude as it did." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 128, 956 A.2d 1145 (2008).

"Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in consider-

ing the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion."[13] (Internal quotation marks omitted.) *State* v. *Fisher*, 342 Conn. 239, 269, 269 A.3d 104 (2022). "[A]n *expert witness is not ordinarily permitted to express an opinion on an ultimate issue of fact* which is to be decided by the trier of fact. . . . Experts can sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass." (Emphasis added; internal quotation marks omitted.) *State* v. *Pjura*, 68 Conn. App. 119, 122, 789 A.2d 1124 (2002).

In the present case, the defendant argues that Killian's testimony was offered with respect to the cause of the plaintiff's harm. Although the question of causation generally "belongs to the trier of fact because causation is essentially a factual issue"; (internal quotation marks omitted) *Alexander* v. *Vernon*, 101 Conn. App. 477, 485, 923 A.2d 748 (2007); the defendant claims that the court improperly prevented Killian from testifying that "it was extraordinarily abnormal for the [Children's] Probate Court clerk to have placed the plaintiff's medical records in a public file accessible by Mendoza" because that testimony was at the core of its theory that the mishandling of the plaintiff's records by the Children's Probate Court broke the chain of causation between the defendant's conduct and the plaintiff's injuries.

Even if we were to assume for the sake of argument that the court abused its discretion by limiting Killian's testimony, which we do not, we conclude that the defendant has failed to demonstrate that it was harmed or substantially prejudiced by the court's ruling and that an injustice has occurred. Our conclusion is predicated on our close reading of Killian's testimony before the jury.[14] Killian testified that he considered medical records to be confidential: "Any medical record, regardless of how it comes to the court, is a confidential record. . . . [I]t's usually received in an envelope marked confidential medical record, usually with a copy of a subpoena on top of it. And it would be put into a confidential file." He indicated that no person has access to the confidential file but that there is a public file that is available to the general public. "In virtually everything that happens in a Probate Court, at least every contested matter in the Probate Court, medical testimony, medical records are a component of the evidence that's presented to the court. So the securing of those records has always been something in which the court had a role. And the protection of those records, until they were properly admitted into evidence, was also the responsibility of the clerk and the court." If an envelope containing medical records arrived at the Probate Court without a subpoena or court order on the front of it, Killian stated that the envelope should not be opened until there is a determination of why the

medical record came to the court, and then the judge determines what is to be done with the record.

Killian clarified that he was testifying as to "the manner in which evidence comes into a court in probate, whether it be medical or otherwise, pursuant to one of the several avenues by which it could come in, and I'm testifying by an implicit responsibility. If some piece of medical testimony falls from the sky . . . [and somebody brings] it to the Probate Court, the responsibility of the court [is] to . . . treat that as a confidential document."

Killian acknowledged that there was no written Probate Court policy, procedure or directive in 2005. He indicated that the prescribed method for handling medical records filed with the Probate Court is "historic" and stated that the statute regarding medical records; see footnote 10 of this opinion, quoting General Statutes § 45a-98b; applies to any probate proceeding in the Superior Court or the Probate Court. Before medical records can be disclosed, the adverse party must have an opportunity to object. If the adverse party objects to the disclosure of the records, the judge must hold a hearing to determine whether the records are admissible.

In addition, Killian testified in response to a question from counsel: "I find it impossible to believe that you think a Probate Court that has a . . . medical record dumped on it is free to put it in a public file now, 2005, 2004, or the 1800s, when this whole process was initially instituted in the state of Connecticut. It's evidence . . . that is protected and it's evidence that is confidential. Once the court rules and it becomes evidence in the trial, then it goes into the public record, whether it's medical or otherwise, the exception being psychiatric information." "When an item comes into court, it is clearly identifiable as a medical record, but you don't know what process it went to, the response is not to put it in the public file. The response is to find out how it came into the court. The process is to find out whether you are properly in possession of that document. The clerk knows that he or she is the gatekeeper of the court. That's their responsibility. And if a document comes in and they don't know what it is or what to do with it, or it defies the rules that they have seen in the past for these types of documents, then their job is to go and talk either—if it's an assistant clerk, to talk to the clerk; if it's the clerk, talk to the judge. That's the process and that's the process that's mandated for documents that come into a court going back a long time." In conclusion, Killian repeated that he had no doubt that medical records should be treated as confidential documents.

On the basis of our detailed review of Killian's testimony on direct and cross-examination and the court's jury charge, we conclude that it is not likely that the

limitations the court imposed on Killian's testimony affected the outcome of the trial and, therefore, that the defendant was not prejudiced by the court's rulings. Although Killian did not opine with regard to the specific facts of this case or use the words "extraordinarily abnormal" with regard to the probate clerk's handling of the plaintiff's medical records, his testimony left no doubt that, pursuant to more than one hundred years of Probate Court policy and procedure, the clerk mishandled the records by placing them in the public file before being ordered to do so by the probate judge. Killian's testimony was detailed and specific. He spelled out the procedures a probate clerk should follow to protect the confidentiality of medical records that are received by the Probate Court, regardless of whose records they are or how they were delivered to the court.

There was evidence before the jury pursuant to the parties' stipulation that the defendant copied and mailed the plaintiff's medical records to the Children's Probate Court and that the records were placed in a publicly accessible file. Killian testified as to the manner in which medical records are to be handled in the Probate Court. Given the testimony that was allowed, the members of the jury were perfectly capable of determining whether the clerk's handling of the plaintiff's records was so "extraordinarily abnormal" that it broke the chain of causation between the defendant's conduct and the plaintiff's injury. We therefore conclude that the defendant was not harmed and no injustice resulted from the court's limiting of the scope of Killian's testimony.[15]

II

The defendant next claims that the court permitted the plaintiff to submit a claim for future emotional damages to the jury on the basis of a single vague, speculative statement in a hearsay report that was inconsistent with other, uncontested medical evidence. The defendant argues that the court improperly (1) admitted a report prepared by the plaintiff's treating psychologist into evidence, (2) charged the jury on future emotional harm without sufficient evidence, and (3) denied the defendant's request to submit a jury interrogatory that distinguished past and future damages.[16] We are not persuaded by these claims.

A

The defendant claims that the court improperly admitted into evidence the psychological report (report) written by the plaintiff's treating psychologist. We are not persuaded.

The following facts are relevant to the defendant's claim. In 2005, soon after the plaintiff learned that Mendoza had read her medical records, the plaintiff sought treatment from David Brosell, a psychologist. She saw Brosell from September, 2005, until August, 2008, and

again early in 2010. In April, 2010, Brosell authored and signed a report at the request of the plaintiff's counsel with regard to his therapeutic work with the plaintiff. Brosell's initial diagnosis of the plaintiff's condition was adjustment disorder with anxiety and depression. After working with the plaintiff, Brosell changed the diagnosis to major depression, single episode, mild, and later added a diagnosis of post-traumatic stress disorder.

In 2010, the plaintiff disclosed Brosell as an expert witness along with his contemporaneous treatment records and the report. In September, 2010, the defendant's counsel deposed Brosell with respect to his treatment of the plaintiff and his report. At the time of trial in 2018, Brosell was retired and too infirm to testify. The defendant did not object to Brosell's treatment records being admitted into evidence but filed a motion in limine to exclude the report on the grounds that it was addressed to the plaintiff's counsel in preparation for litigation and that Brosell had assigned 75 percent of the plaintiff's post-traumatic stress disorder diagnosis to the release of her medical records to Mendoza.[17] The defendant further contended that there was nothing in Brosell's treatment records to substantiate his conclusion with respect to the plaintiff's post-traumatic stress disorder.

The parties appeared before the court for a hearing on the motion in limine. Counsel for the defendant acknowledged that he had received Brosell's report prior to deposing him and that he deposed Brosell with regard to his treatment records and portions of his report. Counsel, however, did not question Brosell about his conclusions regarding the percentage of the plaintiff's post-traumatic stress disorder attributable to the release of her medical records or that the plaintiff may sustain future emotional damages due to post-traumatic stress. See footnote 17 of this opinion. Counsel indicated that he intended to cross-examine Brosell about those matters at trial. The defendant, therefore, claimed that it was at a disadvantage because Brosell was not able to testify at trial. The court found that the defendant's counsel had a copy of the report years earlier when he deposed Brosell and that Brosell's opinion was not a recent disclosure that disadvantaged the defendant. The court therefore denied the motion in limine as to Brosell's opinion that 75 percent of the plaintiff's post-traumatic stress disorder was due to the disclosure of her medical records. At trial, agreed on portions of Brosell's deposition testimony were read to the jury and his treatment records were admitted into evidence without objection. The report, with agreed on redactions, was submitted into evidence and published to the jury.

On appeal, the defendant argues that the report should not have been admitted into evidence because it was prepared for litigation, was inadmissible hearsay, and

was eight years old. The plaintiff argues that the report was admissible because it met the requirements of General Statutes § 52-174 (b)[18] because Brosell had signed the report, citing *Bruneau* v. *Seabrook*, 84 Conn. App. 667, 854 A.2d 818, cert. denied, 271 Conn. 930, 859 A.2d 583 (2004).

As stated in part I of this opinion, "evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *Stokes* v. *Norwich Taxi, LLC*, 289 Conn. 465, 489, 958 A.2d 1195 (2008). Our review of evidentiary rulings is limited to whether "the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *S. A.* v. *D. G.*, 198 Conn. App. 170, 183, 232 A.3d 1110 (2020).

In *Bruneau*, the plaintiff, who was injured in a motor vehicle crash, offered a letter from her treating physician to her attorney into evidence. *Bruneau* v. *Seabrook*, supra, 84 Conn. App. 668–69. The trial court found that the letter was signed by the physician, was written on his letterhead, and was consistent with his treatment records. Id., 672. On appeal, the defendant claimed that the court had not properly interpreted § 52-174 (b) when it admitted the letter into evidence without fulfilling the business entry requirements of General Statutes § 52-180. Id., 670. This court concluded that the trial court properly had admitted the physician's letter into evidence, reasoning that "[o]ur Supreme Court has set forth the requirements for a report to be admissible pursuant to § 52-174 (b). [Section 52-174 (b)] permits a signed doctor's report to be admitted as a business entry. . . . [It] creates a presumption that the doctor's signature is genuine and that the report was made in the ordinary course of business. . . . Thus, once the statutory requirement that the report be signed by a treating physician is met, the evidence in that report is admissible and has the same effect as a business entry. . . . This statute serves the purpose of getting medical evidence before the jury in the absence of the treating physician." (Internal quotation marks omitted.) Id., 671.

Like in *Bruneau*, Brosell's report was written on his stationery and was signed by him. Accordingly, there is a presumption that it was made in the ordinary course of business and, therefore, was admissible as a business entry. Although the defendant claims that there was insufficient evidence in Brosell's contemporaneous treatment records to support a claim for future damages, it does not claim that the report generally is inconsistent with Brosell's treatment records. The defendant objected to the admission of the report because, when deposing him, counsel chose not to question Brosell about certain opinions stated in the report. The court found that the report had been disclosed to the defendant eight years

prior to trial and that the defendant had an opportunity to depose Brosell. In the intervening years, Brosell retired and was unable to testify at trial.

The defendant's claim that Brosell's report was not admissible in this case because it was prepared in anticipation of litigation is without merit. Although it is true that such reports *may under certain circumstances be inadmissible* under § 52-174 (b) if the objecting party is not afforded an opportunity to depose or cross-examine the author at trial; see *DeMaria* v. *Bridgeport,* 339 Conn. 477, 492–95, 261 A.3d 696 (2021); the defendant in the present case was in possession of the report when it deposed Brosell in 2010 and, therefore, did have an opportunity to cross-examine Brosell as to all of his opinions. Under these circumstances, the court did not abuse its discretion when it admitted Brosell's report as a full exhibit with the redactions to which the parties had agreed. See id., 492–93.

B

The defendant also claims that there was insufficient evidence for the court to submit the plaintiff's claim for future damages to the jury. We do not agree.

"[A] trial court should instruct a jury on [every] issue for which there is any foundation in the evidence . . . ." (Internal quotation marks omitted.) *Wasko* v. *Farley,* 108 Conn. App. 156, 169, 947 A.2d 978, cert. denied, 289 Conn. 922, 958 A.2d 155 (2008). To resolve the defendant's claim that there was insufficient evidence to submit the plaintiff's claim for future damages to the jury, we review the record, including the pleadings, the evidence, and the court's instructions. See, e.g., *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 532–43, 733 A.2d 197 (1999) (determining whether court properly denied motion to set aside verdict on ground of insufficient evidence); *Krondes* v. *Norwalk Savings Society*, 53 Conn. App. 102, 111–17, 728 A.2d 1103 (1999) (determining whether evidence was insufficient to warrant directed verdict).

The November 3, 2010 operative complaint alleges in relevant part: "As a result of [the defendant's] breach of its contractual obligations, the plaintiff has suffered damages including, but not limited to . . . [s]evere emotional distress, trauma, and anxiety, all of which [have] physically manifested in the form of headaches, severe depression, sleeplessness and nausea . . . ." At trial, the plaintiff claimed that the defendant's release of her medical records caused her emotional injury in the immediate aftermath of Mendoza's harassment and that she continues to suffer emotional distress. The court likewise instructed the jury that "the plaintiff seeks to recover noneconomic damages for each of the following type[s] of nonmonetary losses or injuries: mental and emotional suffering, loss or diminution of the ability to enjoy life's pleasures and permanent injury

or loss of function." The court also instructed the jury as to the plaintiff's life expectancy. The defendant did not challenge the court's instructions.

In arguing that there was not sufficient evidence to submit the plaintiff's claim of future damages to the jury, the defendant contends that the only evidence of future injuries is reflected in one sentence in Brosell's report where he opined that the plaintiff's post-traumatic stress disorder had eased with the passage of time but that she could experience the symptoms again "should [she] be again faced with events similar to those which originally triggered the Posttraumatic Stress Disorder symptoms." The defendant argues that damages for future or ongoing injury are available only on a showing of reasonable probability, not reasonable possibility, of the injury occurring and that the single sentence in Brosell's report was not sufficient to support a finding of reasonable probability.

In rejecting the defendant's challenge to the sufficiency of the evidence of the plaintiff's claim for future damages, the court noted Brosell's report, in addition to the testimony of Michele Reed, a licensed clinical social worker who treated the plaintiff in 2013,[19] and held that the evidence was sufficient for the court to instruct the jury on future noneconomic damages. In addition, the court cited the plaintiff's testimony in response to the question as to how she has been damaged by the release of her private health information by the defendant and its use by Mendoza against her. The plaintiff testified: "I mean, it's hard to describe all the emotional harm. I mean, it caused a lot of suffering, a tremendous amount of anxiety and hurt and sadness." Also, she testified that she "didn't go for medical care unless it was absolutely necessary to . . . . I was afraid that anything would be released, you know—I didn't feel—I no longer felt safe as a patient."

The court reasoned that, on the basis of the evidence presented, including the length of time from the admitted negligence of the defendant to the verdict, "[a] trier of facts can conclude, by inference, that an injury will be permanent even though there is no medical testimony expressly substantiating permanency." *Royston* v. *Factor*, 1 Conn. App. 576, 577, 474 A.2d 108, cert. denied, 194 Conn. 801, 477 A.2d 1021 (1984). "This principle is based on the recognition by Connecticut courts that jurors are able to evaluate for themselves the testimony of the plaintiff, as well as the nature and duration of the injury, the likelihood of its continuance into the future, and the lack of total recovery by the time of trial. . . . If a jury has the opportunity to appraise the condition of a plaintiff and its probable future consequence, an award of damages for permanent injury and for future pain and suffering is proper." (Citations omitted; footnote omitted.) *Parker* v. *Supermarkets General Corp.*, 36 Conn. App. 647, 650–51, 652 A.2d 1047 (1995).

The defendant further argues that there is tension between Brosell's report and evidence provided by her other treating physicians. The fact that there was contrary evidence in the record, however, is no reason for the court not to instruct the jury on future noneconomic damages. Factual disputes are issues for the trier of fact to determine. See *Martinez* v. *New Haven*, 328 Conn. 1, 8, 176 A.3d 531 (2018).

On the basis of our review of the record, we conclude that the court properly submitted the plaintiff's claim for future noneconomic damages to the jury on the basis of the evidence presented at trial.

C

The defendant also claims that the court abused its discretion when it denied its request to submit to the jury interrogatories distinguishing past and future damages. We disagree.

"The power of the trial court to submit proper interrogatories to the jury, to be answered when returning [its] verdict, does not depend upon the consent of the parties or the authority of statute law. In the absence of any mandatory enactment, it is within the reasonable discretion of the presiding judge to require or to refuse to require the jury to answer pertinent interrogatories, as the proper administration of justice may require. . . . The trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content." (Internal quotation marks omitted.) *Wilkins* v. *Connecticut Childbirth & Women's Center*, 176 Conn. App. 420, 430, 171 A.3d 88 (2017).

The record discloses that the court charged the jury on December 5, 2018. During the morning, prior to the luncheon recess, the court instructed the jury on the substantive law. The court reserved its instructions regarding the jury's duties on retiring for deliberations until after lunch. After the jury was excused, counsel for the defendant stated: "It's fortunate that we took that break there. One thing I forgot to mention this morning is I am requesting a jury interrogatory to separate out future and past emotional harm. If I don't . . . under a general verdict, I don't think I can contest the entry of evidence on future harm." The court reserved its decision but, following the luncheon recess, denied the defendant's interrogatory request.

The court addressed the present claim when ruling on the defendant's motion for a new trial and to set aside the verdict. In its memorandum of decision, the court noted that the defendant had requested the interrogatory after the court had given the majority of its charge to the jury. The court cited Practice Book § 16-22, which requires that "written requests for jury interrogatories must be filed with the clerk [of the court] before the beginning of arguments or at such an earlier

time as the juridical authority directs" and found that the defendant's request was untimely filed. We agree with the court that the defendant's request to submit an interrogatory regarding damages to the jury was not timely and, therefore, conclude that the court did not abuse its discretion by denying the defendant's request.

### III

The defendant finally claims that the court improperly awarded the plaintiff offer of judgment interest by concluding that the addition of the trustee as a party plaintiff validated the plaintiff's April 30, 2009 offer of judgment as of October 6, 2010, the date on which the trustee became a party to this action. We disagree.

"The question of whether the trial court properly awarded interest pursuant to § 52-192a is one of law subject to de novo review." (Internal quotation marks omitted.) *Birkhamshaw* v. *Socha*, 156 Conn. App. 453, 512, 115 A.3d 1, cert. denied, 317 Conn. 913, 116 A.3d 812 (2015).

The following procedural history is relevant to this claim. On December 18, 2006, the plaintiff filed a Chapter 7 petition for bankruptcy relief in the United States Bankruptcy Court for the District of Vermont, and Wolinsky was appointed trustee of the bankruptcy estate that same day. On May 23, 2007, the bankruptcy court granted the trustee's application to employ special counsel for the bankruptcy estate to pursue a claim against the defendant. On October 4, 2007, the plaintiff alone, not the trustee, commenced the present action.

On April 30, 2009, pursuant to § 52-192a and Practice Book § 17-14, the plaintiff filed an offer of judgment in the amount of $50,000. On May 1, 2009, the defendant filed an objection to the offer of judgment on the grounds that it was deficient and premature in that the plaintiff had failed to specify all damages known to her, to respond to the defendant's discovery requests for authorizations and the disclosure of experts, and to file a certification with the court that the plaintiff had provided the defendant with all documents supporting her damages. The defendant's objection was not adjudicated prior to the time the jury returned its verdict in 2018.

On September 3, 2010, the plaintiff filed a motion to add the trustee as a plaintiff pursuant to General Statutes § 52-108[20] and Practice Book §§ 9-18 through 9-20.[21] On September 17, 2010, the defendant filed a conditional objection to the motion to add the trustee as a party plaintiff, noting that a pretrial in the case was scheduled for October 13, 2010, and trial was scheduled to begin on October 27, 2010. The defendant stated in its objection that it did not object to adding the trustee as a party plaintiff as long as the plaintiff disclosed all relevant discovery as it pertained to the bankruptcy action and the current action. The court, *Hon. Richard P. Gagli-*

*ardi*, judge trial referee, set the matter down for a hearing on October 6, 2010, and ordered the plaintiff to produce any and all documents pertaining to the bankruptcy. The motion to add the trustee was heard and granted at the October 6, 2010 hearing.

Following two separate appeals to our Supreme Court, the trial began in November, 2018. On December 5, 2018, the jury returned a verdict in favor of the plaintiff for $853,000 in noneconomic damages.

On December 7, 2018, the defendant filed a supplemental memorandum in support of its May 1, 2009 objection to the plaintiff's offer of judgment. In its supplemental objection, the defendant argued that the offer of judgment was invalid on its face for failing to comply with § 52-192a and Practice Book § 17-14A. The defendant further argued that the offer of judgment was not valid, as our Supreme Court only recently had recognized a cause of action sounding in tort against a health care provider in the event of an unauthorized disclosure of confidential information obtained in the course of a physician-patient relationship. On January 7, 2019, the plaintiff filed a motion for, inter alia, offer of judgment interest. On March 7, 2019, the defendant filed an objection to the plaintiff's motion for offer of judgment interest, arguing for the first time that the plaintiff's offer of judgment was invalid when filed because she was in bankruptcy at the time and, therefore, lacked standing to file the offer of judgment. The defendant also argued, inter alia, that the earliest date on which interest could accrue was the date on which the trustee was added.

On July 8, 2019, the court held a hearing on the plaintiff's motion for offer of judgment interest and the defendant's objection thereto.[22] On September 4, 2019, the court issued an order granting in part the plaintiff's motion for offer of judgment interest. In issuing the order, the court noted that on December 18, 2006, prior to the commencement of the present action, the plaintiff had filed for voluntary bankruptcy relief and Wolinsky had been appointed trustee of her bankruptcy estate. The trustee, however, was not made a party plaintiff until October 6, 2010. After concluding that the offer of judgment satisfied the requirements of § 52-192a, the court turned to the question of whether and when the offer of judgment became valid. Relying on our Supreme Court's holding in *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 998 A.2d 730 (2010), the court concluded that "the offer of judgment was not validated until the bankruptcy trustee was substituted as a party plaintiff, which occurred on October 6, 2010." As a result, the court awarded the plaintiff prejudgment interest at the rate of 12 percent, computed from October 6, 2010, the date the trustee was added as a party plaintiff, and $350 in attorney's fees.

On appeal, the defendant argues that the court

improperly relied on *DiLieto* in concluding that the addition of the trustee as a party plaintiff validated the plaintiff's offer of judgment. In *DiLieto*, our Supreme Court held that the substitution of the bankruptcy trustee as the plaintiff retroactively validated the offers of judgment previously filed by Michelle DiLieto, one of the original plaintiffs, as of the date of substitution, such that interest began to accrue as of that date. *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 297 Conn. 111. In so holding, the court acknowledged that "DiLieto's offers of judgment were invalid at the time she tendered them because . . . the cause of action belonged to her bankruptcy estate. Thus, if the defendants had attempted to accept the offers within thirty days, in the normal course, they would not have been binding on [the trustee], and, consequently, they would not necessarily have served to settle the action." Id., 154. The court nevertheless held that "interpreting [General Statutes] §§ 52-109[23] and 52-192a to relieve the defendants altogether of their obligation to pay offer of judgment interest would result in a windfall for them and, at the same time, unfairly penalize [the trustee], in contravention of both the punitive purposes of § 52-192a . . . and the remedial purposes of § 52-109." (Citation omitted; footnote added.) Id., 159.

Like DiLieto, the plaintiff in the present case erroneously filed this action on her own, without the trustee, and tendered an offer of judgment prior to the trustee's joinder in the case. As in *DiLieto*, the enforcement of the offer of judgment in the present case resulted in no actual prejudice to the defendant, who made a strategic decision not to accept the offer. See id., 158. Therefore, the present case is procedurally indistinguishable from *DiLieto*, and the punitive and remedial statutory purposes cited by our Supreme Court in *DiLieto* apply equally here.[24] The defendant does not argue to the contrary.

Indeed, at the July 8, 2019 hearing on the plaintiff's motion for offer of judgment interest and the defendant's objection to that motion, the defendant acknowledged that *DiLieto* resolved this issue in that a previously tendered invalid offer of judgment is "resurrected" when the trustee is added as a party to the action. Although counsel for the defendant posited that the court in *DiLieto* failed to consider the necessity of obtaining approval from the bankruptcy court for the trustee to settle a claim, he acknowledged to the trial court that it was bound to follow the holding of *DiLieto*.[25]

Despite its explicit agreement with the trial court that *DiLieto* was dispositive of this issue and that the court was bound to follow it, the defendant now argues that the trial court incorrectly relied on *DiLieto* in the present case in that it "ignored the second part of *DiLieto*'s holding and improperly applied the fact spe-

cific, first impression outcome in *DiLieto* to a 'future case,' contrary to *DiLieto*'s clear instruction." In so arguing, the defendant is referring to footnote 47 in *DiLieto*, in which the court stated: "To avoid any possible confusion in future cases . . . a party that is substituted as a plaintiff under § 52-109 shall either repudiate the original offer of judgment upon substitution, refile that original offer of judgment, or file a new offer of judgment, at that substituted plaintiff's discretion. It is true, of course, that, as a general matter, a plaintiff is permitted to file only one offer of judgment, which may be refiled in the same amount as many times as he or she chooses. . . . When, as in the present case, however, an offer of judgment has been filed by the original plaintiff and, thereafter, a new plaintiff is substituted into the case, we see no reason why the substituted plaintiff should be precluded from filing a new offer of judgment when that original offer of judgment was invalid when filed; in addition, the correct plaintiff should not be denied the opportunity to file his own offer of judgment, unfettered by the offer filed by the incorrect plaintiff. Finally, we note that, in light of the issues raised by our resolution of this claim, the legislature and the rules committee of the Superior Court may wish to clarify the procedures applicable to offers of judgment when a plaintiff is substituted for the original plaintiff under § 52-109."[26] (Citations omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 297 Conn. 159 n.47.

At no point throughout the lengthy pendency of this case before the trial court, did the defendant assert this argument, and, as noted in the preceding paragraphs, counsel for the defendant actually agreed, as do we, that, pursuant to *DiLieto*, the offer of judgment filed by the plaintiff was validated upon the addition of the trustee as a party plaintiff.[27] "It is a well settled principle of appellate review that a party cannot invite a trial court to take a position and then, after the court has adopted that position, claim error. This is because, if we were to endorse such behavior, we effectively would be sanctioning trial by ambush, which we have repeatedly stated we will not allow. [A] party cannot take a path at trial and change tactics on appeal." (Internal quotation marks omitted.) *In re David B.*, 167 Conn. App. 428, 444, 142 A.3d 1277 (2016).

Even if the defendant had argued to the trial court that *DiLieto* does not apply to the present case because of the court's directive in footnote 47; see *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 297 Conn. 159 n.47; its reliance on footnote 47 is misplaced. Because that footnote is not necessary to the resolution of the claim presented in *DiLieto*, it is dictum on which we may not rely in resolving the claim presented in the present case. See *State* v. *Torres*, 85 Conn. App. 303, 320, 858 A.2d 776 ("Dictum is generally defined as [a]n expression in an opinion which is not

necessary to support the decision reached by the court. . . . A statement in an opinion with respect to a matter which is not an issue necessary for decision. . . . Our Supreme Court has instructed that dicta have no precedential value." (Citation omitted; internal quotation marks omitted.)), cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004).

Additionally, the defendant's proposed interpretation of footnote 47 is inconsistent with the court's holding in *DiLieto*, in that it suggests that the trustee must take some affirmative action to validate an offer of judgment that was filed prior to the trustee's addition to the case, whereas *DiLieto* holds that the previously filed offer of judgment is validated on the trustee's joinder. *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 297 Conn. 145, 159 n.47. The dissonance between the footnote and the holding of the court is further underscored by the language in the footnote suggesting that a trustee may repudiate an offer of judgment that was filed before he or she was brought into the case, which presupposes the validity of that offer of judgment. See id. The holding in *DiLieto* clearly rejected the notion that an offer of judgment filed prior to the joinder of the proper plaintiff was valid. Id., 154. Accordingly, any reliance on footnote 47 would constitute a departure from the principles of stare decisis. See *Sepega* v. *DeLaura*, 326 Conn. 788, 798–99 n.5, 167 A.3d 916 (2017) ("While stare decisis is not an inexorable command . . . the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some special justification. . . . Such justifications include the advent of subsequent changes or development in the law that undermine[s] a decision's rationale . . . the need to bring [a decision] into agreement with experience and with facts newly ascertained . . . and a showing that a particular precedent has become a detriment to coherence and consistency in the law . . . ." (Citation omitted; internal quotation marks omitted.)). Moreover, the court did not, in footnote 47, state that in future cases the substitution of a party would not validate a previously filed invalid offer of judgment. See *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 159 n.47. We therefore reject the defendant's invitation to interpret footnote 47 in a manner that would require us to depart from the principles of stare decisis. Instead, we interpret the footnote as a direction, rather than a mandatory requirement, to parties to take steps to avoid the uncertainty and confusion that might otherwise result if a substituted party fails to take some affirmative action with respect to a previously filed offer of judgment. That interpretation is consistent with the court's further invitation to "the legislature and the rules committee of the Superior Court . . . to clarify the procedures applicable to offers of judgment when a plaintiff is substituted for the original plaintiff under § 52-109." Id.

Finally, since *DiLieto* was decided, neither the legislature nor the rules committee of the Superior Court has amended the statutes or rules governing the procedures applicable to offers of judgment when a bankruptcy trustee is substituted as a party plaintiff under § 52-109. "[T]he doctrine of stare decisis and the tenet[s] of statutory interpretation . . . [caution] against overruling case law involving our construction of a statute, if the legislature reasonably may be deemed to have acquiesced in that construction . . . ." *Peek* v. *Manchester Memorial Hospital*, 342 Conn. 103, 125–26, 269 A.3d 24 (2022). "[T]he legislature is presumed to be aware of the [courts'] interpretation of a statute and . . . its subsequent nonaction may be understood as a validation of that interpretation . . . ." (Internal quotation marks omitted.) *Dairyland Ins. Co.* v. *Mitchell*, 320 Conn. 205, 215, 128 A.3d 931 (2016). Because neither the legislature nor the rules committee has taken any action to clarify or modify the procedures at issue, despite our Supreme Court's express suggestion that they do so, we presume that the legislature approved of our Supreme Court's holding in *DiLieto*, and the trial court properly followed it.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Pursuant to a bankruptcy petition filed by the plaintiff in 2006, the bankruptcy trustee, Douglas J. Wolinsky, was made a party plaintiff in 2010. In this opinion, we refer to Byrne as the plaintiff and to Wolinsky as the trustee.

[2] General Statutes (Rev. to 2005) § 52-192a provides in relevant part: "(a) After commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may, not later than thirty days before trial, file with the clerk of the court a written 'offer of judgment' signed by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. . . . Within sixty days after being notified of the filing of the 'offer of judgment' and prior to the rendering of a verdict by the jury or an award by the court, the defendant or the defendant's attorney may file with the clerk of the court a written 'acceptance of offer of judgment' agreeing to a stipulation for judgment as contained in plaintiff's 'offer of judgment'. Upon such filing, the clerk shall enter judgment immediately on the stipulation. If the 'offer of judgment' is not accepted within sixty days and prior to the rendering of a verdict by the jury or an award by the court, the 'offer of judgment' shall be considered rejected and not subject to acceptance unless refiled. Any such 'offer of judgment' and any 'acceptance of offer of judgment' shall be included by the clerk in the record of the case.

"(b) After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in the plaintiff's 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount, computed from the date such offer was filed in actions commenced before October 1, 1981. In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the 'offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the 'offer of judgment' was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. . . ."

General Statutes (Rev. to 2005) § 52-192a was the subject of subsequent amendments in 2005, 2007 and 2011, none of which is applicable to the present case. See Public Acts 2011, No. 11-77, § 1; Public Acts 2007, No. 07-

141, § 16; Public Acts 2005, No. 05-275, § 4. Of note, the 2005 amendment substitutes the term "offer of compromise" for the term "offer of judgment." Public Act 05-275. The 2005 amendment, however, is applicable to actions accruing on or after October 1, 2005, the date that the amendment took effect. Public Act 05-275. The plaintiff's cause of action in this case accrued prior to that date. We therefore refer to the offers in the present case as offers of judgment in accordance with the applicable statutory language. All references to § 52-192a throughout this opinion are to the 2005 revision.

[3] "We note that the operative complaint in the present case alleges that the plaintiff discovered she was pregnant around the same time she terminated her relationship with Mendoza." *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, supra, 314 Conn. 437 n.4.

[4] "We also note that, according to the operative complaint, Mendoza has utilized the information contained within these records to file numerous civil actions, including paternity and visitation actions, against the plaintiff, her attorney, her father and her father's employer, and to threaten her with criminal charges." *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, supra, 314 Conn. 437 n.5.

[5] General Statutes § 52-146o provides in relevant part: "(a) Except as provided in sections 52-146c to 52-146j, inclusive, sections 52-146p, 52-146q and 52-146s, and subsection (b) of this section, in any civil action or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding, a physician or surgeon, licensed pursuant to section 20-9, or other licensed health care provider, *shall not disclose* (1) any communication made to him or her by, or any information obtained by him or her from, a patient or the conservator or guardian of a patient with respect to any actual or supposed physical or mental disease or disorder, or (2) any information obtained by personal examination of a patient, *unless the patient or that patient's authorized representative explicitly consents to such disclosure. . . .*" (Emphasis added.)

We note that the legislature made certain changes to § 52-146o subsequent to 2005 that are not relevant to the present appeal. See Public Acts 2013, No. 13-208, § 63; Public Acts 2011, No. 11-129, § 20. For the sake of simplicity, all references to § 52-146o within this opinion are to the current revision of the statute.

[6] The plaintiff withdrew her claim of negligent misrepresentation before trial.

[7] After the parties had conducted discovery, they filed cross motions for summary judgment. The defendant's motion for summary judgment addressed all four counts of the complaint. On April 7, 2011, the trial court, *Hon. Richard P. Gilardi*, judge trial referee, denied the defendant's motion for summary judgment with respect to the breach of contract and negligent misrepresentation counts because there were genuine issues of material fact. *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 327 Conn. 540, 547, 175 A.3d 1 (2018). With regard to the negligence and negligent infliction of emotion distress counts, the court treated the motion for summary judgment as a motion to dismiss. Id., 544. The court agreed with the defendant that HIPAA does not provide a private cause of action and that HIPAA, therefore, preempted any Connecticut common-law action dealing with the confidentiality/privacy of medical information. Id., 544–45. The court dismissed those counts. Id., 547. The plaintiff appealed. See *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, supra, 314 Conn. 436 n.3 (permission to appeal).

On appeal, our Supreme Court reversed the judgment of dismissal, concluding that, "if Connecticut's common law recognizes claims arising from a health care provider's alleged breach of its duty of confidentiality in the course of complying with a subpoena, HIPAA and its implementing regulations do not preempt such claims. . . . HIPAA and its implementing regulations may be utilized to inform the standard of care applicable to such claims arising from allegations of negligence in the disclosure of patients' medical records pursuant to a subpoena." Id., 458–59. The court remanded the case for further proceedings. Id., 463.

On remand, the defendant filed another motion for summary judgment with respect to the negligence and negligent infliction of emotional distress counts of the complaint on the ground that "no Connecticut court had ever recognized a common-law cause of action against a health care provider for breach of its duty of confidentiality" in responding to a subpoena. *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, supra, 327 Conn. 548. The trial court, *Arnold, J.*, agreed with the defendant that no Connecticut court had recognized a common-law privilege for communications between a patient and physicians and that recognition of such a cause of action is

best addressed by the state's appellate courts or the legislature. Id. The plaintiff appealed once more. See id., 541 n.2 (permission to appeal).

Our Supreme Court framed the issue on appeal as "whether a patient has a civil remedy against a physician if that physician, *without the patient's consent*, discloses confidential information obtained in the course of the physician-patient relationship." (Emphasis added.) Id., 550. The court recognized that " '[t]he principle of confidentiality lies at the heart of the physician-patient relationship,' " that "a cause of action for the breach of the duty of confidentiality in the physician-patient relationship by the disclosure of medical information is not barred by § 52-146o or HIPAA and that public policy, as viewed in a majority of other jurisdictions that have addressed the issue, supports that recognition." Id. The court reversed the judgment and again remanded the case for further proceedings. Id., 573.

[8] We note that the defendant did not file any special defenses to the plaintiff's complaint; nor did it serve an apportionment complaint on any third party.

[9] The plaintiff did not claim economic damages.

[10] Killian testified that Probate Courts are to handle medical records pursuant to General Statutes § 45a-98b. General Statutes § 45a-98b provides in relevant part: "In any proceeding before a court of probate, the court may issue an order for the disclosure of medical information relevant to the determination of the matter before the court. . . . Any such medical information filed with the court shall be confidential."

[11] Counsel for the defendant asked the court for clarification of its ruling. The following colloquy transpired:

"[The Defendant's Counsel]: I don't understand . . . part of your holding words said not specific to this case. . . . I just want clarification on that.

* * *

I'm going to ask him in general if . . . there was a policy of a court to get the records and simply put them into the file, generally speaking, would that be a good—

"The Court: He did not testify to that. He testified . . . we're going to testify as to the Probate Court procedures in general. . . . [H]e's testified to the fact that the Probate Court procedure is X. . . . And you're asking him, if you don't do that, then you're not following the procedure. It's implied. I'm not going to allow it in. . . . You're asking him to draw a conclusion that something . . . that he's already laid the fact."

[12] The court instructed the jury that the next witness was Killian, "a retired probate judge that will testify as to certain Probate Court . . . procedures in general. He is offered by the defense only to provide testimony as to the cause of the plaintiff's injuries. I remind you that the . . . Children's [Probate] Court and its staff are not parties to this action and are not liable to the plaintiff [for] any of her damages claimed in this action. The defendant has admitted liability. The testimony is being offered only on the issue of proximate cause. I will instruct you further on proximate cause when I instruct you on the applicable law at the end of the case."

[13] The plaintiff does not dispute that Killian is an expert on Probate Court procedures.

[14] Killian testified that he had been a Probate Court judge for more than thirty years and had heard approximately 50,000 cases, including approximately 10,000 cases dealing with children and paternity matters. In addition, Killian had been a member of the Probate Assembly, a statutory body to which all probate judges are members, and had been a member of the executive committee of the Probate Assembly for approximately twenty-five years. At the time of trial, he was still a member of the Probate Court Rules Committee. All probate judges are subject to the continuing education requirements of the Probate Assembly, which include education about how a probate clerk is to handle confidential documents that are submitted to the Probate Court.

[15] Although the defendant states in its brief that it is not claiming instructional error, it argues that the wording of the court's instruction was confusing, which made the court's limitation on Killian's testimony more harmful because it hindered the defendant's proximate cause defense. The defendant asserts that the court preliminarily had instructed the jury that the defendant had admitted liability and that Killian's testimony was being offered only on the issue of proximate cause. The defendant argues, however, that it did not admit liability; it admitted only that it was negligent, citing *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 578, 717 A.2d 215 (1998), for the proposition that a negligent act, if not the proximate cause of the injury, does not impose legal liability on an actor.

The time for the defendant to raise this argument has passed. The defendant did not take exception to the court's instruction when the court could have cured the purported instructional confusion. See *Mauro* v. *Yale-New Haven Hospital*, 31 Conn. App. 584, 592, 627 A.2d 443 (1993) (reason for taking exceptions to charge is to alert court to possible error at time when court can correct it).

The defendant also argues, again without claiming instructional error, that the court failed to give the requested instruction that " 'each party has a right to assume, until he has reason to believe otherwise, that other actors will obey the rules of law and act reasonably and properly,' " and its position in the present case is that it expected the Children's Probate Court to handle the plaintiff's records properly. The defendant presented no evidence, however, that it was familiar with Probate Court practices or procedures concerning medical records when it sent the plaintiff's medical records to the Children's Probate Court.

[16] The plaintiff argues that our review of the defendant's challenge to the jury's verdict for future damages is barred by the general verdict rule. Because we affirm all of the court's challenged rulings concerning future damages, we need not decide whether the defendant's untimely request for a jury interrogatory to distinguish the jury's verdict between past and future damages constitutes a proper request for a jury interrogatory that would preclude the application of the general verdict rule in this case. See *Garcia* v. *Cohen*, 335 Conn. 3, 12, 225 A.3d 653 (2020) (" 'where the court has denied a proper request for interrogatories . . . the general verdict rule does not apply so as to preclude appellate review of error relating to any ground upon which the jury may have rested its verdict and to which an appropriate interrogatory has been directed' ").

[17] Brosell's report stated in relevant part: "In this client's case, there [was] a long series of traumatic episodes (the filing of court cases, the sending of e-mails to various people associated with the client, the placing of a notice in the local newspaper, etc.) which had a cumulative effect upon the client. As these events subsided, the client reported some gradual easing of the anxiety related symptoms. When faced again with the evidence of these events having happened, there was again a rise in the symptoms. My expectation is that this pattern will continue, should the client be again faced with events similar to those which originally triggered the Posttraumatic Stress Disorder symptoms. I would also expect that, over time, there would be a gain in mastery over the anxiety reactions and a better ability to sense some control over events. I am not qualified to predict the existence and extent of a permanent disability beyond that. . . .

"Causal connection between the incident that is the subject of the lawsuit (Emily Byrne v. Avery Center for Obstetrics & Gynecology, P.C.) and [the plaintiff's] diagnosis

As stated above, in this case there was a series of traumatic episodes which had a cumulative effect upon the client and resulted in the development of Posttraumatic Stress Disorder. The incident which is the subject of this lawsuit is one of these. As such it played a significant part in the development of the client's symptoms of Posttraumatic Stress Disorder. What is significant about this particular incident is that it placed in the hands of a person who was engaging in a series of legal actions and other traumatizing actions against the client information which was felt by the client to be shaming, humiliating, and damaging to the client's reputation. This information was used by the person to whom the information was released in ways which the client experienced as traumatizing. As such it was the event that precipitated the client's seeking treatment. It is my opinion, based on a reasonable degree of medical certainty, that the release of the client's medical records was responsible for 75 [percent] of the client's experience of trauma and the development of Posttraumatic Stress Disorder."

[18] General Statutes § 52-174 (b) provides in relevant part: "In all actions for the recovery of damages for personal injuries . . . any party offering in evidence a signed report . . . for treatment of any treating . . . psychologist . . . may have the report . . . admitted into evidence as a business entry and it shall be presumed that the signature on the report is that of such treating . . . psychologist . . . and that the report . . . [was] made in the ordinary course of business. . . ."

[19] Reed was deposed and her testimony was read to the jury. Reed testified in part that the plaintiff was "worrying chronically and [experienced] lots of obsessive thinking." According to Reed, her symptoms were consistent with general anxiety disorder and post-traumatic stress disorder. With respect to "the post-traumatic stress disorder . . . she would have bad

dreams and she also would avoid . . . if the lawyer called, if there was anything about lawyers in connection with this happening, she would want to avoid [that] because the anxiety would be incredible for her . . . ." Reed also described how, in the plaintiff's mind, the disclosure of her private health information became linked with her past trauma.

[20] General Statutes § 52-108 provides: "An action shall not be defeated by the nonjoinder or misjoinder of parties. New parties may be added and summoned in, and parties misjoined may be dropped, by order of the court, at any state of the action, as the court deems the interests of justice require."

[21] Practice Book § 9-18 provides: "The judicial authority may determine the controversy as between the parties before it, if it can do so without prejudice to the rights of others; but, if a complete determination cannot be had without the presence of other parties, the judicial authority may direct that they be brought in. If a person not a party has an interest or title which the judgment will affect, the judicial authority, on its motion, shall direct that person to be made a party. (See General Statutes § 52-107 and annotations.)"

Practice Book § 19-19 provides: "Except as provided in Sections 10-44 and 11-3 no action shall be defeated by the nonjoinder or misjoinder of parties. New parties may be added and summoned in, and parties misjoined may be dropped, by order of the judicial authority, at any stage of the cause, as it deems the interests of justice require. (See General Statutes § 52-108 and annotations.)"

Practice Book § 19-20 provides: "When any action has been commenced in the name of the wrong person as plaintiff, the judicial authority may, if satisfied that it was so commenced through mistake and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff. (See General Statutes § 52-109 and annotations.)"

[22] The defendant had filed additional postverdict motions that also were heard on that date, but they are not relevant to the issue before us.

[23] General Statutes § 52-109 provides: "When any action has been commenced in the name of the wrong person as plaintiff, the court may, if satisfied that it was so commenced through mistake, and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff."

[24] The defendant concedes, and we agree, that the substitution of the bankruptcy trustee as a party plaintiff in *DiLieto*, versus the addition of the trustee in the present case, does not distinguish the present case from *DiLieto*. In support of that position, the defendant cites *Fairfield Merritt-view Ltd. Partnership* v. *Norwalk*, 320 Conn. 535, 133 A.3d 140 (2016), for the proposition that the addition or substitution of the trustee is permissible, in that either serves the same function of saving "an action [that] was commenced in the name of the wrong party, instead of the real party in interest, whose presence is required for a determination of the matter in dispute." Id., 553. Our Supreme Court noted that the substitution or addition of parties is discretionary and intimated that they may be used interchangeably to achieve the desired remedial goal of ensuring that the proper parties are brought into the action. Id., 555 n.23. This court has explained: "Our rules of practice . . . permit the substitution of parties as the interests of justice require. General Statutes §§ 52-108, 52-109; Practice Book §§ [9-19 and 9-20] . . . . These rules are to be construed so as to alter the harsh and inefficient result that attached to the mispleading of parties at common law. . . . [Section] 52-108 and Practice Book § [9-19] provide that no action shall be defeated by the nonjoinder or misjoinder of parties. [Section] 52-109 and Practice Book § [9-20] allow a substituted plaintiff to enter a case [w]hen any action has been commenced in the name of the wrong person as plaintiff . . . . Both rules, of necessity, relate back to and correct, retroactively, any defect in a prior pleading concerning the identity of the real party in interest. In the context of analogous rules of federal civil procedure, it has been observed that [w]here the change is made on the plaintiff's side to supply an indispensable party or to correct a mistake in ascertaining the real party in interest, in order to pursue effectively the original claim, the defendant will rarely be unfairly prejudiced by letting the amendment relate back to the original pleading. . . . As long as [the] defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, his ability to protect himself will not be prejudicially affected if a new plaintiff is added . . . ." (Citations omitted; internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Retirement Management Group, Inc.*, 31 Conn. App. 80, 84–85, 623 A.2d 517, cert. denied, 226 Conn.

908, 625 A.2d 1378 (1993).

[25] At the July 8, 2019 hearing, the defendant began its opposition to the plaintiff's motion for offer of judgment interest by arguing that the offer of judgment was invalid because the trustee was not a party to the case when it was filed. In response to that argument, the court asked: "[D]oes *DiLieto* then take care of that, once the trustee's appointed?" Counsel for the defendant acknowledged: "If you have an offer of judgment that's invalid, it can be resurrected when it becomes valid. So when the trustee is appointed . . . it would relate to the date of the order granting the adding of the trustee as a party." Counsel for the defendant proceeded to argue that *DiLieto* failed to consider the fact that the trustee needs approval from the bankruptcy court to settle a case, and, therefore, the acceptance of an offer of judgment could not immediately settle a case as required by § 52-192a. Counsel for the defendant told the court, however: "I think if you follow *DiLieto*, which I think Your Honor has to follow, *DiLieto* says that you can—you can have an otherwise invalid offer of judgment . . . [and] once it becomes valid, it becomes valid. I still think there's a practical issue on how . . . it gets accepted under those circumstances. But clearly nobody accepted it under these circumstances."

[26] We note that this is the sole basis of the defendant's challenge to the trial court's adherence to *DiLieto* in this case. The defendant does not contend that *DiLieto* is legally or procedurally distinguishable from this case.

[27] The defendant also argues that interest on the offer of judgment should not have commenced until January, 2018, because, prior to that date, there did not exist a private cause of action for a violation of patient confidentiality. The defendant asserted this same argument before the trial court, but the trial court did not address it and the defendant, thereafter, did not seek an articulation of the court's silence on that claim. Because "[t]his court is unable to review claims that were not expressly addressed by the trial court"; *Miller* v. *Miller*, 124 Conn. App. 36, 40, 3 A.3d 1018 (2010); it is not properly before us now. We further note that, because "[a]n offer of judgment is an offer to settle the entire case, including claims both known and unknown, and both certain and uncertain"; (internal quotation marks omitted) *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 750, 687 A.2d 506 (1997); the defendant's claim that offer of judgment interest could not begin to run until our Supreme Court recognized the plaintiff's cause of action is unavailing.

---